# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

U.S. SMALL BUSINESS ADMINISTRATION,

      Appellant,[1]

v.                                                   Civ. No. 20-473 MV/GBW

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,

      Appellee.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the undersigned on Appellant's Notice of Appeal and Statement of Election (*doc. 1*) pursuant to the Court's Order of Reference (*doc. 15*). Having reviewed the related briefing *(docs. 22, 24, 25)* and submissions of supplemental authority *(docs. 26, 27, 28, 29)*, and being fully advised in the premises, I recommend REVERSING the final judgment of the U.S. Bankruptcy Court for the District of New Mexico ("Bankruptcy Court") for the reasons discussed below.

---

[1] I conclude that Appellee's adversary proceeding is only against the U.S. Small Business Administration ("SBA"), and not also against the SBA Administrator in her official capacity. While the proceeding's complaint lists the latter in its caption and articulates claims against her, *see* Bankruptcy Record on Appeal ("BRA") vol. 1 at 4–18, it does not plead her as a party, *see id.* at 5. This omission may be why the Bankruptcy Court's final judgment omits the Administrator from its caption, enjoins only the SBA, and declares only the SBA's actions unlawful. *See id.* at 113–14. This finding, though, has limited import since claims against the SBA are equivalent to claims against the SBA Administrator in her official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

# I.    BACKGROUND

This appeal arises from an adversary proceeding that Appellee, a tax-exempt

nonprofit corporation in a Chapter 11 bankruptcy proceeding, filed against Appellant,

the U.S. Small Business Administration ("SBA"), in the Bankruptcy Court.  Bankruptcy

Record on Appeal ("BRA") vol. 1 at 4–18.  Appellee sought a declaratory judgment that

the SBA's implementation of the Paycheck Protection Program ("PPP")—a temporary,

short-term program under which the SBA guarantees loans with favorable terms to

eligible recipients—violated the Administrative Procedure Act ("APA") and Chapter 11

of the U.S. Code.  *Id.* at 17.  Appellee also requested the Bankruptcy Court to

preliminarily and permanently enjoin the SBA from denying Appellee a PPP loan for

being bankrupt and to issue a writ of mandamus under 28 U.S.C. § 1361 to compel the

SBA Administrator to remove language disqualifying bankruptcy debtors from PPP

loan applications.  *Id.* at 17–18.  For reasons to be explained later, the Bankruptcy Court

granted Appellee the requested declaratory and injunctive relief in a final judgment.  *Id.*

at 119–20.  It did not reach the writ of mandamus issue.

## A.  STATUTORY & REGULATORY BACKGROUND

The parties dispute the legality of a final rule issued by the SBA on April 28,

2020, that bars bankruptcy debtors from receiving PPP loans.  *See* Business Loan

Program Temporary Changes; Paycheck Protection Program—Requirements—

Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23,450,

23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 & 121) (hereinafter "Fourth Rule"). Before addressing the validity of this bankruptcy bar and the authority of the Bankruptcy Court to enter a final judgment on this issue and enjoin the SBA therein, it is useful to place this rule in its statutory and regulatory context.

1. *Pre-CARES Act Statutory Context*

The SBA is a federal agency created by Congress to "aid, counsel, assist, and protect insofar as it is possible the interests of small-business concerns." *SBA v. McClellan*, 364 U.S. 446, 447 (1960) (quoting Small Business Act of 1953, Pub. L. No. 83-163, § 202, 67 Stat. 232, 232 (1953)). Among the "extraordinarily broad powers" that Congress gave to the agency to accomplish this objective was "lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." *Id.* The primary mechanism through which the SBA does so is a Section 7(a) loan, named after the section of the Small Business Act of 1958 that authorizes its issuance. These loans "may be made either directly or in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis." 15 U.S.C. § 636(a). In practice, the SBA prefers the latter, indirect approach. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979).

In, and since, the Small Business Act of 1958, Congress created, and has periodically amended, a broad statutory regime for Section 7(a) loans. *See* Small

Business Act of 1958, Pub L. No. 85-536, § 7(a), 72 Stat. 384, 387–88 (1958) (codified in 15

U.S.C. § 636(a)).  One statutory requirement is that all Section 7(a) loans "shall be of

such sound value or so secured as reasonably to assure repayment."  15 U.S.C. §

636(a)(6).  Another requirement is that no Section 7(a) loan "shall be extended … if the

applicant can obtain credit elsewhere."  *Id.* § 636(a)(1)(A)(i).  A third requirement sets

the SBA's participation levels in agreements to participate in a loan on a deferred basis.

*Id.* § 636(a)(2)(A) (requiring the SBA's participation to be seventy-five percent of the

balance of the financing outstanding at the time of a loan's disbursement if that balance

exceeds $150,000, or eighty-five percent of the balance of financing outstanding at that

time if that balance is less than or equal to that sum).  A fourth requirement caps the

total amount that the SBA may lend (or guarantee) to a borrower.  *Id.* § 636(a)(3)(A)

(prohibiting the execution of Section 7(a) loan if the total outstanding, committed

amount to the borrower from the business loan and investment fund established by

chapter 14A of title 15 of the U.S. Code would exceed $3,750,000).

Over time, Congress has also created several special Section 7(a) loans and

exempted them from statutory requirements that apply to ordinary Section 7(a) loans.

*See, e.g.,* Small Business Reauthorization and Manufacturing Assistance Act of 2004 §

101(a), 15 U.S.C. § 636(a)(31) (creating the express loan program and limiting the

maximum loan amount in this program to $350,000); Military Reservist and Veteran

Small Business Reauthorization and Opportunity Act of 2008 § 208, 15 U.S.C. §

636(a)(33) (creating the increased veteran participation program and discounting the guarantee fee set in 15 U.S.C. § 636(a)(18) by fifty percent for this program's loans); Small Business Export Enhancement and International Trade Act of 2010 § 1206(f), 15 U.S.C. § 636(a)(34) (creating the export express program, limiting the program's maximum loan amount to $500,000, and setting the guaranty rates for this loan at ninety percent if the loan is for no more than $350,000 and seventy-five percent if the loan exceeds that sum).

2. *Pre-CARES Act Regulatory Context*

Turning to the regulatory regime, in the Small Business Act of 1958, Congress authorized the SBA Administrator to fill in the gaps of the Section 7(a) loan statutory scheme as necessary to implement the program. *See* § 5(b), 72 Stat. at 386 (codified in 15 U.S.C. § 634(b)) (vesting the Administrator with the authority to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this Act" and "take any and all actions …. determined by him to be necessary or desirable in making… or otherwise dealing with or realizing loans made under the provisions of this this Act").

Wielding this authority, the SBA Administrator has issued regulations establishing six criteria that an applicant must satisfy to qualify for an ordinary Section 7(a) loan: (i) operate a business organized for profit in the United States, 13 C.F.R. § 120.100(a)–(c); (ii) have a number of employees or sum of annual receipts that does not

exceed the designated size for its industry, *id.* §§ 120.100(d), 121.201; (iii) demonstrate

need for the desired credit, *id.* §§ 120.100(e), 120.101; (iv) be creditworthy, *id.* § 120.150;

(v) not be a type of ineligible business, *id.* § 120.110; and (vi) have a sound business

purpose for the loan, *id.* § 120.120. *See generally* Office of Fin. Assistance, U.S. Small Bus.

Admin., SOP 50 10 5(K), Lender and Development Company Loan Programs (2019)

(hereinafter "SOP 50 10 5(K)").

The SBA Administrator has also issued regulations and guidance documents for

Section 7(a) loan lenders. *See, e.g.*, 13 C.F.R. § 120.410; SOP 50 10 5(K). Among other

things, these regulations specify the criteria that a lender must satisfy to make Section

7(a) loans in partnership with the SBA and how a lender obtains "delegated authority"

to issue loans without the SBA reviewing loan applications. *See* 13 C.F.R. §§ 120.410,

120.440. Guidance documents detail an underwriting process and factors—like an

applicant's bankruptcy history—that a lender must consider during it. SOP 50 10 5(K)

at 177–180. At the conclusion of this process, the lender makes an eligibility decision

that is subject to the SBA's review unless the lender has delegated authority. *Id.* at 177.

3. *CARES Act*

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic

Security ("CARES") Act to mitigate the economic challenges posed by the COVID-19

pandemic. Section 1102 of this Act amends 15 U.S.C. § 636(a) to add another special

Section 7(a) loan to the SBA's Section 7(a) loan portfolio, the PPP. CARES Act, Pub. L.

No. 116-136, § 1102, 134 Stat. 281, 286 (2020) (codified in 15 U.S.C. § 636(a)(36)).  Section

1106 of this Act provides that, subject to certain limitations, the balance of a PPP loan

may be forgiven in an amount up to the sum of certain costs incurred and payments

made during an eight-week period beginning on the PPP loan's origination date.[2]  *Id.* §

1106, 134 Stat. at 297 (codified in 15 U.S.C. § 636m).

To structure the PPP, Congress modified several statutory requirements that

apply to ordinary Section 7(a) loans—just like it did for other special Section 7(a) loan

programs.  Congress set the SBA's participation level in an agreement to participate in a

PPP loan on a deferred basis at one hundred percent.  *Id.* § 1102, 134 Stat. at 286

(codified in 15 U.S.C. § 636(a)(2)(F)).  It also expanded borrower eligibility for a PPP

loan to include nonprofit organizations and entities able to obtain credit elsewhere.  *Id.*

at 288, 291 (codified in 15 U.S.C. § 636(a)(36)(D)(i), (I)).  Finally, Congress provided that,

"[e]xcept as otherwise provided in [15 U.S.C. § 636(a)(36)], the [SBA] Administrator

may guarantee [PPP] loans under the same terms, conditions, and processes as a loan

made under [15 U.S.C. § 636(a)]."  *Id.* at 287 (codified as 15 U.S.C. § 636(a)(36)(B)).

On the lender side, Congress granted all lenders approved to make other Section

7(a) loans delegated authority to make and approve PPP loans without SBA review.  *Id.*

---

[2] During the pendency of this appeal, Congress has amended this period to end on the date that is either eight weeks or twenty-four weeks after the PPP loan's origination date.  *See* Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Pub. L. No. 116-260, § 306, 134 Stat. 1993, 1997 (2020) (codified in 15 U.S.C. § 636m(b)).

at 290 (codified as 15 U.S.C. § 636(a)(36)(F)(ii)(I)).  It also required them to consider

whether a PPP loan applicant was in operation on February 15, 2020, and paying

employees or independent contractors at this time.  *Id.* (codified as 15 U.S.C. §

636(a)(36)(F)(ii)(II)).

To implement the PPP, Congress mandated that the SBA Administrator issue, no

later than fifteen days after the enactment of the CARES Act, "regulations to carry out

[title I of the Act] and the amendments made by this title without regard to the notice

requirements under [5 U.S.C. § 553(b)]."  *Id.* § 1114, 134 Stat. at 312.  Pursuant to this

mandate, in April 2020, the SBA Administrator promulgated four interim rules about

the PPP.  *See* Business Loan Program Temporary Changes; Paycheck Protection

Program, 85 Fed. Reg. 20,811 (Apr. 15. 2020) (to be codified at 13 C.F.R. pt. 120)

(hereinafter "First Rule"); Business Loan Program Temporary Changes; Paycheck

Protection Program, 85 Fed. Reg. 20,817 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt.

120) (hereinafter "Second Rule"); Business Loan Program Temporary Changes;

Paycheck Protection Program—Additional Eligibility Criteria & Requirements for

Certain Pledges of Loans, 85 Fed. Reg. 21,747 (Apr. 20, 2020) (to be codified at 13 C.F.R.

pt. 120) (hereinafter "Third Rule"); Fourth Rule, 85 Fed. Reg. 23,450.

Among other things, the First Rule modifies several general Section 7(a) loan

eligibility criteria as to PPP loans and reduced lenders' underwriting obligations.  *See*

First Rule, 85 Fed. Reg. at 20,812–13, 20,815.  It removes the organization-for-profit

criterion as to certain nonprofit organizations and eliminates the no-credit-elsewhere criterion as to all applicants. *Id.* at 20,812, 20,816. It also amends the business-size criterion to be satisfied by having either no more than 500 employees (regardless of industry) or the number of employees designated for its industry. *Id.* at 20,812. The rule also suspends the creditworthiness criterion in 13 C.F.R. § 120.159 but retains 13 C.F.R. § 120.110 as the list for ineligible business (except as to certain nonprofit organizations made eligible by the CARES Act). *Id.* at 20,812. With respect to underwriting, the First Rule allows a lender to assess eligibility based on an applicant's good faith certifications about its operational, employment, and loan application history, its economic need, its intended use of funds, and the validity of attached documentation. *Id.* at 20,814–15.

The First Rule does not explicitly comment on a bankruptcy debtor's eligibility for a PPP loan. *See id.* at 20,812–17. However, the PPP borrower application form (issued a few weeks earlier and referenced in the First Rule, *see id.* at 20,814) asks an applicant if it or any of its owners is "presently involved in any bankruptcy" and provides that an affirmative answer prevents the approval of the loan. BRA vol. 1 at 19. Similarly, the PPP lender guaranty application form (issued contemporaneously with that for the borrower) asks whether the applicant has certified that neither it nor any of its owners is "presently involved in any bankruptcy" and states that a negative answer prevents approval of the loan. *Id.* at 24.

The Second and Third Rules make no reference to bankrupt PPP loan applicants. *See generally* Second Rule, 85 Fed. Reg. 20,817; Third Rule, 85 Fed. Reg. 21,747. However, the Third Rule reiterates "that, unlike other SBA loan programs, … the standard underwriting process does not apply because no creditworthiness assessment is required for PPP Loans." 85 Fed. Reg. at 21,750.

The Fourth Rule provides a definitive statement on a bankruptcy debtor's ineligibility for a PPP loan. It states that "[i]f the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan." Fourth Rule, 85 Fed. Reg. at 23,451. It explains that "providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or nonrepayment of unforgiven loans." *Id.*

4. *Subsequent Legislation*

Since April 2020, Congress has passed several pieces of legislation relevant to PPP loans, none of which abrogates the Fourth Rule's bankruptcy bar. *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, § 101, 134 Stat. 620, 620 (2020) (appropriating additional PPP funds); Paycheck Protection Program Flexibility Act of 2020, Pub. L. No. 116-142, §§ 2–3, 134 Stat. 641, 641–43 (2020) (adding a minimum maturity for PPP loans, expanding the period for loan forgiveness, and modifying loan forgiveness criteria); Extending Authority for Commitments for the

Paycheck Protection Program and Separating Amounts Authorized, Pub. L. No. 116-147, § 1, 134 Stat. 660, 660 (2020) (extending the time period for obtaining a PPP loan and clarifying that funds appropriated for other Section 7(a) loans during fiscal year 2020 may not be used for PPP loans); Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Pub. L. No. 116-260, §§ 301–43, 134 Stat. 1993, 1993–2051 (2020) (extending the time period for obtaining a PPP loan, clarifying that entities not in operation on February 15, 2020 are ineligible for a loan, prohibiting publicly traded entities from receiving a loan, and extending loan eligibility to additional types of entities); American Rescue Plan Act of 2021, Pub L. No. 117-2, § 5001, 135 Stat. 81, 82–83 (2021) (expanding PPP loan eligibility to additional nonprofit organizations and internet publishing organizations); PPP Extension Act of 2021, Pub. L. No. 117-6, §§ 1–3, 135 Stat. 250, 250 (2021) (extending the time period for obtaining a PPP loan).

In the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Congress also amended Section 364 of the Bankruptcy Code to allow a bankruptcy court to authorize certain bankruptcy debtors to obtain a PPP loan. § 320, 134 Stat. at 2015. However, it deferred the effectiveness of this amendment until

> the date on which the [SBA] Administrator submits to the Director of the Executive Office for United States Trustees a written determination that, subject to satisfying any other eligibility requirements, any debtor in possession or trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of title 11, United States Code, would be eligible for a [PPP] loan.

*Id.* at 2016.

B. FACTUAL & PROCEDURAL BACKGROUND

On December 3, 2018, Appellee petitioned for Chapter 11 bankruptcy in the

Bankruptcy Court.  BRA vol. 3 at 7–8, 10.  As no trustee has been appointed, Appellee is

a debtor-in-possession pursuant to 11 U.S.C. §§ 1107, 1108.  BRA vol. 1 at 98.  On April

20, 2020, Appellee applied for a $900,000 PPP loan from Wells Fargo, which took no

action on the application due to the bankruptcy ineligibility provision in the borrower

and lender guaranty application forms.  *Id.* at 102.

The following day, Appellee filed the underlying Complaint for Declaratory

Judgment, Writ of Mandamus, and Injunctive Relief against the SBA as an adversary

proceeding in the Bankruptcy Court.  BRA vol. 1 at 2, 4.  In Count I, it alleges that the

exclusion of bankruptcy debtors from the PPP exceeds the SBA's statutory authority in

contravention of the APA.  *Id.* at 10–12.  In Count II, it alleges that this exclusion is

arbitrary, capricious, or an abuse of discretion in violation of the APA.  *Id.* at 12–14.  In

Count III, it alleges that this exclusion violates the non-discriminatory requirements of

11 U.S.C. § 525(a).  *Id.* at 14–16.  And in Count IV, Appellee alleges that it is entitled to a

writ of mandamus under 28 U.S.C. § 1361 to compel the SBA Administrator to remove

the bankruptcy debtor exclusion provisions from the PPP loan applications.  *Id.* at 16–

17.  In addition to the writ of mandamus, Appellee sought declaratory judgments on

Counts I through III and a preliminary and permanent injunction enjoining the SBA and

its Administrator from denying it a PPP loan for being a bankruptcy debtor.  *Id.* at 17.

On April 30, 2020—two days after the SBA Administrator issued the bankruptcy bar in the Fourth Rule—the Bankruptcy Court held a hearing on the preliminary injunction during which it converted proceedings into a trial on the merits.  *Id.* at 97. The following day, the Bankruptcy Court issued an opinion that found that the bankruptcy bar in the Fourth Rule amounted to a final agency determination that denied Appellee a PPP loan and declared that this bar was arbitrary and capricious, exceeded the SBA's statutory authority, and violated 11 U.S.C. § 525(a).  *Id.* at 105–11. Alongside this opinion, the Bankruptcy Court entered a final judgment that memorialized its findings in three declaratory judgments and enjoined the SBA to process Appellee's PPP loan application without regard to its status as a Chapter 11 debtor in possession.  *Id.* at 113–14.

The SBA timely appealed the final judgment to this Court.  *Doc. 1.*  On July 23, 2020, the Honorable Judge Vázquez referred the appeal to the undersigned, *doc. 15*, who set a briefing schedule, *doc. 16*.  After several extensions, *docs. 18, 20*, the SBA filed its opening brief on October 22, 2020.  *Doc. 22.*  On November 23, 2020, Appellee filed its response.  *Doc. 23.*  On December 7, 2020, the SBA filed its reply, completing briefing on the appeal.  *Doc. 25.*  Since then the SBA has filed three notices of supplemental authority, *docs. 26, 28, 29*, one of which received a response from Appellee, *doc. 27*.  No oral argument has been conducted since "the facts and legal arguments are adequately

presented in the briefs and records, and the decisional process would not be significantly aided by oral argument."  Fed. R. Bankr. P. 8019(b)(3).

## II.      BANKRUPTCY COURT OPINION

The Bankruptcy Court's final judgment rests on three holdings.  First, the Bankruptcy Court held that the Fourth Rule's bankruptcy bar is arbitrary and capricious under the APA for three reasons: (i) Congress did not "intend[] to cede to [the SBA] discretion to exclude bankruptcy debtors from the PPP," BRA vol. 1 at 106; (ii) the PPP is functionally a grant program whose eligibility requirements do not include creditworthiness, *id.* at 106–07; and (iii) an applicant's bankruptcy status is immaterial to its likelihood of complying with the PPP, *id.* at 107–08.

Second, the Bankruptcy Court held that the bankruptcy bar exceeds the SBA's statutory authority in violation of the APA since the CARES Act did not grant the SBA the authority to set eligibility requirements for a PPP loan or exclude bankruptcy debtors from the PPP.  *Id.* at 108–09.  Finally, the Bankruptcy Court held that the bar discriminated against Appellee in violation of 11 U.S.C. § 525(a) since a PPP loan is functionally a grant.  *Id.* at 109–10.

## III.     STANDARD OF REVIEW

This Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).  In reviewing the Bankruptcy Court's final judgment, the Court must "apply the same standards of review that govern appellate review in other cases."  *Country*

14

*World Casinos, Inc. v. Tommyknocker Casino Corp. (In re Country World Casinos, Inc.)*, 181

F.3d 1146, 1149 (10th Cir. 1999).  Thus, questions of law are reviewed de novo and

discretionary decisions for abuse of discretion.  *Busch v. Busch (In re Busch)*, 294 B.R. 137,

140 (B.A.P. 10th Cir. 2003) (citing *Pierce v. Underwood,* 487 U.S. 552, 558 (1988)).  The

Bankruptcy Court's findings of fact bind the Court unless they are clearly erroneous.  *Id.*

## IV.    ANALYSIS

On appeal, the SBA makes two arguments about the Bankruptcy Court's lack of

authority to issue parts of its final judgment and three arguments about the judgment's

substance.  *See doc. 22* at 9–10.  With respect to authority, the SBA contends that the

Bankruptcy Court's injunction contravenes its sovereign immunity.  *Id.* at 21–22.  It also

argues that the final declaratory judgments on Counts I and II violate 28 U.S.C. § 157(c)

since these counts are "non-core proceedings" in which the Bankruptcy Court only has

the authority to issue a proposed findings and recommended disposition ("PFRD").  *Id.*

at 22–25.  Substantively, the SBA argues that the Fourth Rule's bankruptcy bar does not

exceed its statutory authority, is not arbitrary and capricious, and does not violate 11

U.S.C. § 525(a).  *Id.* at 25–44.  I conclude that the SBA is correct on each point.

### A.  THE BANKRUPTCY COURT'S AUTHORITY TO ISSUE THE FINAL JUDGMENT

I agree with the SBA that the Bankruptcy Court lacked the authority to enter

parts of its final order.  The injunction therein exceeds the Bankruptcy Court's authority

since Congress has not waived the SBA's immunity from injunctive relief or given the Bankruptcy Court the authority to issue a final order enjoining a governmental agency under 5 U.S.C. § 706(1). Similarly, the order's declaratory judgments on Counts I and II exceed the Bankruptcy Court's authority since Congress has not granted bankruptcy judges the authority to enter a final order in an adversarial proceeding that holds unlawful and sets aside an agency action that is arbitrary and capricious or in excess of the agency's statutory authority.

1. *Impropriety of Injunctive Relief Against the SBA under 15 U.S.C. § 634(b)*

The injunction in the Bankruptcy Court's final judgment violates the SBA's sovereign immunity from injunctive relief. The SBA "has the full sovereign immunity of the United States unless such immunity has been waived by congressional action." *United States v. Mel's Lockers, Inc.*, 346 F.2d 168, 169 (10th Cir. 1965). 15 U.S.C. § 634(b) waives the sovereign immunity of the SBA Administrator except that "no … injunction … shall be issued against the Administrator or his property." 15 U.S.C. § 634(b)(1). As the SBA is an agency, the APA also waives its sovereign immunity from claims for injunctive relief where it unlawfully withholds or unreasonably delays action so long as no other statute that grants consent to suit expressly or implicitly forbids such relief. 5 U.S.C. §§ 702, 706(1); *see also Lloyd Wood Const. Co. v. Sandoval*, 318 F. Supp. 1167, 1172 (N.D. Ala. 1970), *rev'd on other grounds sub nom. Allen M. Campbell Co. Gen. Contractors, Inc. v. Lloyd Wood Const. Co.*, 446 F.2d 261 (5th Cir. 1971). Accordingly, whether the SBA

has immunity from an injunction compelling it "to act on [Appellee's] PPP loan application forthwith without regard to [Appellee's] status as a chapter 11 debtor in possession," BRA vol. 1 at 114, depends on whether 15 U.S.C. § 634(b)(1) forbids such relief.

Some circuit courts of appeal interpret 15 U.S.C. § 634(b)(1) narrowly to bar only injunctions that interfere with the SBA's "internal workings." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir. 1987); *see also Related Indus., Inc v. United States*, 2 Cl. Ct. 517, 522 (Cl. Ct. 1983). The Tenth Circuit is not one of them. *See Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) (holding that 15 U.S.C. § 634(b)(1) bars courts from compelling the SBA to execute a release of liability); *Mel's Lockers*, 346 F.2d at 169–70 (holding that 15 U.S.C. § 634(b)(1) bars a bankruptcy court from enjoining the SBA from levying upon the property or assets of a Chapter 11 bankruptcy debtor). Rather, the Tenth Circuit reads 15 U.S.C. § 634(b)(1) as "too clear for misunderstanding that there is no waiver by Congress as to injunction suits." *Mel's Lockers*, 346 F.2d at 170.

*Mel's Lockers* binds the Court. It holds that 15 U.S.C. § 634(b)(1) retains the sovereign immunity of the SBA from all injunctive relief. *Mel's Lockers*, 346 F.2d at 170. As such, the APA does not waive the SBA's immunity from injunctive relief arising from agency action that is unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 702; *Lloyd Wood Const*, 318 F. Supp. at 1172 (holding that 15 U.S.C. § 634(b)(1) bars courts from preliminary enjoining the SBA Administrator pursuant to 5 U.S.C. § 705).

Accordingly, under *Mel's Locker*, courts in the Tenth Circuit may not enjoin the SBA pursuant to 5 U.S.C. § 706(1).

Appellee makes two arguments otherwise.  First, Appellee argues that 15 U.S.C. § 634(b)(1) "protects the agency from interference with its internal workings by judicial orders … but does not provide blanket immunity from every type of injunction." *Doc. 24* at 15 (emphasis omitted) (quoting *Ulstein Maritime*, 833 F.2d at 1057).  It then directs the Court to recent decisions that have followed *Ulstein Maritime*'s interpretation of 15 U.S.C. § 634(b)(1).  *Id.* (citing *Alaska Urological Inst., P.C. v. U.S. Small Bus. Admin.*, 619 B.R. 689, 700 (D. Alaska. 2020), *Gateway Radiology Consultants, P.A. v. Carranza (In re Gateway Radiology Consultants, P.A.)*, 616 B.R. 833, 844 (Bankr. M.D. Fla. 2020), *rev'd on other grounds sub. nom*, *USF Fed. Credit Union v. Gateway Radiology Consultants, P.A. (In re Gateway Consultants, P.A.)*, 983 F.3d 1239 (11th Cir. 2020), and *Springfield Hosp., Inc. v. Carranza (In re Springfield Hosp., Inc.)*, 618 B.R. 70, 95–96 (Bankr. D. Vt. 2020)).  Unlike these other courts, this Court is not writing on a blank slate.  The Tenth Circuit has rejected *Ulstein Maritime*'s interpretation of 15 U.S.C. § 634(b)(1), and this Court is bound by that rejection.  *See Mel's Lockers*, 346 F.2d at 170.

Second, Appellee contends that 15 U.S.C. § 634(b)(1) does not preclude injunctive relief "when the SBA administrator acts outside of her scope of authority." *Doc. 24* at 16 (citing *Dubrow v. Small Bus. Admin.*, 345 F. Supp. 4, 7 (C.D. Cal. 1972)).  It then directs the Court to recent decisions by other courts that have adopted *Dubrow*'s interpretation

of 15 U.S.C. § 634(b)(1). *See id.* (citing *Vestavia Hills, Ltd. v. U.S. Small Bus. Admin. (In re Vestavia Hills, Ltd.)*, 618 B.R. 294, 301 (Bankr. S.D. Cal. 2020), *vacated*, No. 20-cv-01824 GPC-LL, 2021 WL 1263953 (S.D. Cal. Apr. 6, 2021) (unpublished), *Alaska Urological Inst., P.C.*, 619 B.R. at 700, and *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1052 (E.D. Wis. 2020), *appeal dismissed*, No. 20-1729, 2020 WL 6481792 (7th Cir. Aug. 5, 2020) (unpublished)). However, I need not resolve whether *Mel's Lockers* bars the Court from adopting *Dubrow*'s reading of 15 U.S.C. § 634(b)(1) since the SBA did not exceed the scope of its authority when issuing the bankruptcy bar, *see infra* at 32–47. Therefore, I do not reach the question.

### 2. *Impropriety of the Final Judgment's Adjudication of Appellee's APA Claims*

The injunctive and declaratory relief that the Bankruptcy Court's final order awarded on the APA claims in Counts I and II is *ultra vires* since the Bankruptcy Court lacks the statutory authority to enter a final judgment on APA claims raised in an adversary proceeding. Like this Court, the Bankruptcy Court is a court of limited jurisdiction. It has no jurisdiction other than that which Congress has granted it. *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1517 (10th Cir. 1990). In the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress gave district courts original jurisdiction over four classes of bankruptcy matters: (i) "cases under title 11"; (ii) "civil proceedings arising under title 11"; (iii) "civil proceedings … arising in … cases under title 11"; and (iv) "civil proceedings … related to cases under title 11." Pub.

L. No. 98-353, § 101, 98 Stat. 333, 333 (1984) (codified in 28 U.S.C. § 1334(a)–(b)). It also

authorized district courts to refer matters in these four jurisdictional classes to

bankruptcy judges.[3] § 104, 98 Stat. at 340 (codified in 28 U.S.C. § 157(a)).

Unlike Article III judges, however, Congress did not grant bankruptcy judges

plenary authority over every matter that falls within their jurisdiction. Rather, it limited

their final decision-making authority to the first three jurisdictional classes: bankruptcy

cases and so-called "core proceedings." *See id.* (codified in 28 U.S.C. § 157(b)(1)). In the

fourth jurisdictional class—so-called "non-core proceedings"—Congress restricted

bankruptcy judges' adjudicative authority to submitting PFRDs to district courts absent

the consent of the parties. *See id.* (codified in 28 U.S.C. § 157(b), (c)). As the SBA did not

consent for the Bankruptcy Court to issue a final order in the underlying adversary

proceeding, *see* BRA vol. 1 at 50, the propriety of the judgements therein turns on

whether the claims resolved are core or non-core.

"[C]ore proceedings are those that arise in a bankruptcy case or under Title 11,"

while non-core proceedings are those related to a case under this title. *Stern v. Marshall*,

564 U.S. 462, 476 (2011); *see also id.* at 477. A proceeding arises under title 11 if it

"involve[s] a cause of action created or determined by a statutory provision of title 11."

*Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *see also id.* at 97 (providing as

---

[3] This Court has done so. *In re Referral of Bankruptcy Matters to the Bankruptcy Judges*, Misc. No. 84-324
(D.N.M. July 18, 1984).

an example a motion under 11 U.S.C. § 547 to avoid a preference); *see also Gateway*

*Radiology Consultants*, 983 F.3d at 1252 (motion under 11 U.S.C. § 364 for approval to

obtain a PPP loan); *Johnson v. Smith (In re Johnson)*, 575 F.3d 1079, 1083 (10th Cir. 2009)

(adversary action under 11 U.S.C. § 362(k)(1) to recover damages for a willful violation

of the automatic bankruptcy stay).  A proceeding "arises in" a bankruptcy case if, by its

nature—rather than its factual circumstances—it cannot exist outside of a bankruptcy

case.  *Stoe v. Flaherty*, 436 F.3d 209, 218 (3d. Cir. 2006); *see also Gardner*, 913 F.2d at 1518

(adversary action to determine whether a piece of property was part of a bankruptcy

estate); *Butler v. Shanor*, 70 F.3d 1282, 1995 WL 699016, at *2 (10th Cir. Nov. 28, 1995)

(unpublished table decision) (adversary action to determine a bankruptcy estate's

liability for taxes that accrued on a property during the pendency of the bankruptcy

before the estate abandoned it).  By contrast, a proceeding merely relates to a

bankruptcy case if it "do[es] not depend on the bankruptcy laws for [its] existence and

… could proceed in another court."  *Gardner*, 913 F.2d at 1518.

Appellee's APA claims in Counts I and II are non-core proceedings.[4]  *See Gateway*

*Radiology Consultants*, 983 F.3d at 1253; *Breda v. Carranza (In re Breda)*, No. 18-10140, 2020

WL 6840725, at *1 (Bankr. D. Me. June 22, 2020) (unpublished).  These claims are causes

---

[4] Appellee's discrimination claim in Count III, though, is a core proceeding as it implicates a right created by Section 525 of title 11 of the U.S. Code.  *Uplinger v. US Investigations Servs.*, No. 1:13-CV-417, 2013 WL 12107787, at *1 (E.D. Va. Aug. 13, 2013) (unpublished); *Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764, 771 (B.A.P. 10th Cir. 1997).

of action created and determined by title 5 of the U.S. Code, not title 11. *See* BRA vol. 1 at 10–14. In form and substance, these claims exist independently of Appellee's bankruptcy case. The adversary proceeding containing them could have been filed in this Court as a complaint. The claims' legal substance—whether the bankruptcy bar is arbitrary and capricious or exceeds the SBA's statutory authority—does not require a bankruptcy case to exist. Status as a bankruptcy debtor provides Appellee with the injury in fact necessary for it to have standing to challenge the bankruptcy bar under the APA. Standing, however, relates to these claims' factual circumstances, not their legal nature. Mere factual connection to bankruptcy does not make a claim raised in an adversary proceeding core. *See Stoe*, 436 F.3d at 218.

The Bankruptcy Court and Appellee opine that Counts I and II are core proceedings since they "go[] to the heart of case administration." BRA vol. 1 at 104; *see also doc. 24* at 19. "[M]atters concerning the administration of the estate" are core proceedings. 28 U.S.C. § 157(b)(2)(A). However, the APA claims in Counts I and II do not concern the administration of Appellee's bankruptcy estate. They have nothing to do with the appointment, supervision, or termination of a bankruptcy trustee or the bankruptcy estate's employment and compensation of professional persons. *Cf. In re Repository Techs., Inc.*, 601 F.3d 710, 720–21 (7th Cir. 2010) (holding claims relating to a trustee and bankruptcy counsel's administrative duties arose in the bankruptcy case).

The prospect that a favorable decision on Counts I and II (and subsequent receipt of a PPP loan) could impact the administration of Appellee's bankruptcy estate does not transform the APA claims therein into core proceedings. If a claim were core simply because its outcome could affect the administration of a bankruptcy estate, then non-core proceedings would be a null set. *See Stern*, 564 U.S. at 477 ("The terms 'non-core' and 'related' are synonymous."); *Gardner*, 913 F.2d at 1518 ("The test for determining whether a civil proceeding is related in bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." (internal brackets omitted)). "Matters concerning the administration of the estate" and other core proceedings listed in 28 U.S.C. § 157(b)(2) must not be interpreted to encompass all non-core proceedings. *See Wood*, 825 F.2d at 95; *Piombo Corp. v. Castlerock Props. (In re Castlerock Props.)*, 781 F.2d 159, 162 (9th Cir. 1986).

Finally, while not asserted by the parties, the Eleventh Circuit recently held in *Gateway Radiology Consultants* that a bankruptcy judge may enter a final order in a non-core proceeding whose claims are "'necessarily … resolved' in the course of deciding a core matter." 983 F.3d at 1253 (quoting *Stern*, 564 U.S. at 499) (finding that a preliminary injunction entered in an adversary proceeding was a final order). Respectfully however, this holding contravenes the plain language of 28 U.S.C. § 157(c), which precludes bankruptcy judges from entering final orders in non-core proceedings. To reach this holding, the Eleventh Circuit conflated the constitutionality of bankruptcy

judges' final orders with the statutory authority to issue them and reads caselaw about the former to stand for the existence of the latter. *Id.* at 1253–54 (citing *Stern*, 564 U.S. at 497–99, *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313, 321–22 (5th Cir. 2013), and *Waldman v. Stone*, 698 F.3d 910, 920–21 (6th Cir. 2012)).

*Stern* stands for the proposition that Congress may constitutionally vest a bankruptcy judge with the statutory authority to make final judgment on claims whose factual and legal issues are necessarily resolvable by ruling on a core proceeding. *See* 564 U.S. at 503. There, the Supreme Court considered whether a bankruptcy judge could enter a final order on a bankruptcy estate's state law tortious interference counterclaim against a creditor that had filed a proof of a defamation claim in the bankruptcy case and an adversary proceeding based on that claim in the bankruptcy court. *Id.* at 469–70. It held that, while 28 U.S.C. § 157(b)(2)(C) gave the bankruptcy judge the statutory authority to enter this order, the exercise of this authority violated Article III of the Constitution since ruling on the creditor's defamation claim did not necessarily resolve the bankruptcy estate's tortious interference counterclaim. *Id.* at 482, 503.

Similarly, in *Frazin* and *Waldman*, the Fifth and Sixth Circuits held that bankruptcy judges' final orders on state law claims that are "inseparably related" to or "practically subsumed" within a core proceeding are constitutional. *See Frazin*, 732 F.3d at 321 (affirming a bankruptcy judge's judgment on a bankruptcy estate's claims of

attorney malpractice since 11 U.S.C. § 330 required the judge to determine the nature, extent, and value of the attorneys' services when awarding attorney fees over the objection of the estate); *Waldman*, 698 F.3d at 920 (affirming a bankruptcy judge's judgment on a bankruptcy debtor's disallowance claims as 11 U.S.C. § 502(b) authorized the judge to disallow unenforceable claims against the debtor and its property).

However, neither *Stern*, *Frazin*, nor *Waldman* supports the proposition that a bankruptcy judge has the **statutory** authority to enter a final order in a non-core proceeding if its matters are necessarily resolved in a core proceeding. The bankruptcy judges in *Stern* and *Frazin* had the statutory authority to issue a final judgment on the bankruptcy estates' counterclaims because U.S.C. § 157(b)(2)(C) treats these claims as core proceedings. *Stern*, 564 U.S. at 475; *Frazin*, 732 F.3d at 319. In *Waldman*, the Sixth Circuit did not reach the issue of the final order's statutory authority since the defendant creditor had forfeited it by pleading that bankruptcy estate's disallowance claims were core. 698 F.3d at 917. Accordingly, I do not find the reasoning in *Gateway Radiology Consultants* sufficient to disregard the clear language of 28 U.S.C. § 157(c).

The APA claims raised in Counts I and II are non-core proceedings in which the Bankruptcy Court only had the statutory authority to enter a PFRD. Therefore, the permanent injunction and declaratory judgments awarded on these claims in the Bankruptcy Court's final judgment are *ultra vires*.

B. THE SUBSTANCE OF THE BANKRUPTCY COURT'S FINAL JUDGMENT

Turning to the SBA's substantive arguments, I conclude that the SBA is correct on all three of them. The bankruptcy bar does not violate 11 U.S.C. § 525(a) since this provision does not bar the government from denying a bankruptcy debtor a loan for being bankrupt. Nor does the bankruptcy bar exceed the SBA's statutory authority as it is a reasonable interpretation of the CARES Act. Finally, the bankruptcy bar is not arbitrary and capricious because, when issuing it, the SBA did not make a clear error in judgment, consider inappropriate factors, or fail to consider necessary factors.

1. *The Bankruptcy Bar Does Not Impinge 11 U.S.C. § 525(a)*

The bankruptcy bar does not violate 11 U.S.C. § 525(a). The provision provides that "a governmental unit may not deny … a license, permit, charter, franchise, or other similar grant to … a bankrupt or a debtor under the Bankruptcy Act … solely because such bankrupt or debtor is or has been … a bankrupt or debtor under the Bankruptcy Act." 11 U.S.C. § 525(a). The parties agree that a PPP loan is not a license, permit, charter, or franchise and that the bankruptcy bar discriminates against bankruptcy debtors based exclusively on that status. Therefore, the applicability of 11 U.S.C. § 525(a) to a PPP loan turns on whether the loan is an "other similar grant."

The Bankruptcy Code does not define this term and courts have split over its meaning. The majority rule is that an "other similar grant" is an authorization to pursue some endeavor. *See Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th

Cir. 2006); *Toth v. Mich. State Hous. Dev. Auth.*, 136 F.3d 477, 480 (6th Cir. 1998); *Watts v. Pa. Hous. Fin. Co. (In re Watts)*, 876 F.2d 1090, 1093 (3d Cir. 1989).  Such authorizations include professional licenses, driver's licenses, building and business permits, corporate charters, exclusive governmental procurement contracts, and utility franchises.  *Ayes*, 473 F.3d at 108–09; *Exquisito Servs., Inc. v. United States (In re Exquisito Servs., Inc.)*, 823 F.2d 151, 154 (5th Cir. 1987).  They do not include items that "do[] not implicate the government's gate-keeping role in determining who may pursue certain livelihoods" or activities.  *Ayes*, 473 F.3d at 109 (loan or loan guaranty); *see also Toth*, 136 F.3d at 480 (home improvement loan); *Watts*, 876 F.2d at 1093 (loan payments); *Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*, 315 F.3d 80, 95 (2d. Cir. 2002) (Walker, C.J., dissenting) (public housing lease).

One minority rule is that, regardless of the exact meaning of "other similar grant," the term does not include a loan or credit guarantee since licenses, permits, charters, and franchises are all unrelated to credit.  *See Goldrich v. N.Y. State Higher Ed. Servs. Corp. (In re Goldrich)*, 771 F.2d 28, 30 (2d Cir. 1985) (holding that a student loan guarantee is not an "other similar grant"), *superseded by statute*, Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 313, 108 Stat. 4140, 4140–41 (1994) (codified in 11 U.S.C. § 525(c)), *as recognized in Stoltz*, 315 F.3d at 86 n.2.  A second minority rule is that an "other similar grant" is any specific property interest that is unobtainable from the private sector and essential to a debtor's fresh start.  *See Stoltz*, 315 F.3d at 90 (holding that a

public housing lease is an "other similar grant" even though the private sector provides housing leases since it is "obtainable only from governmental entities" and available only to an individual who "cannot afford housing at prevailing market rates"). A final minority rule is that an "other similar grant" is any item whose nonreceipt by a bankruptcy debtor would frustrate "the policy of the Bankruptcy Code of aiding the rehabilitation of the debtor and providing a fresh start." *Exquisito Servs.*, 823 F.2d at 153 (gathering cases); *see also Rose v. Conn. Hous. Fin. Auth. (In re Rose)*, 23 B.R. 662, 666 (Bankr. D. Conn. 1982) (holding that a state housing fund may not condition the issuance a mortgage to an applicant on repayment of a debt discharged in bankruptcy); *In re Heath*, 3 B.R. 351, 353 (Bankr. N.D. Ill. 1980) (holding that a state university may not refuse to issue a transcript based on a student's bankrupt status).

The Tenth Circuit has not waded into this debate. The closest it has come is *Bush v. FDIC*, 999 F.2d 547, 1993 WL 262591 (10th Cir. July 8, 1993) (unpublished table decision), where it commented that "Section 525 is designed to strengthen the protection section 524 affords discharged debtors from being impaired by discrimination related to the discharged debts." *Id.* at *2 (internal quotation marks and citation omitted). This non-precedential comment, though, does little to illuminate the specific instances in which Section 525 bars such discrimination.

I agree with the majority rule's definition of "other similar grants." The starting point in determining the meaning of this term is the language of 11 U.S.C. § 525(a). *See*

*Wadsworth v. The Word of Life Christian Ctr. (In re McGough)*, 737 F.3d 1268, 1273 (10th Cir. 2013). There, the Court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). It must also read "the words of a statute … in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). If the words of a statute are unambiguous when read in this manner, "judicial inquiry is complete." *Germain*, 503 U.S. at 254. If they are ambiguous, then, and only then, may the Court resort legislative history and other methods of ascertaining meaning. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004).

The meaning of "other similar grant" in 11 U.S.C. § 525(a) is unambiguous. Black's Law Dictionary defines "grant" as "[a]n agreement that creates a right or interest in favor of a person or that effects a transfer of a right or interest from one person to another." *Grant*, Black's Law Dictionary (11th ed. 2019). The adjectives "other" and "similar" limit 11 U.S.C. § 525(a) to a subset of grants: those that bear a family resemblance to the licenses, permits, charters, and franchises precede the term in the statute. That resemblance is an authorization to pursue some endeavor or livelihood. *See Ayes*, 473 F.3d at 108; *Toth*, 136 F.3d at 480; *Watts*, 876 P.2d at 1093.

The resemblance is not, as the Second Circuit held in *Stoltz*, a specific property interest that is (i) unobtainable from the private sector and (ii) essential to a debtor's

fresh start.  As noted in Chief Judge Walker's dissent therein, the first element of this reading "derives from the fact that § 525(a) is directed to government units and not to the particular character of licenses, permits, charters, and franchises, as these interests can also be obtained from the private sector."  *Stoltz*, 315 F.3d at 95 (Walker, C.J., dissenting) (internal quotation marks and brackets omitted).  The second element—the quality of being essential to a debtor's fresh start—is not a common characteristic of licenses, permits, charters, and franchises.  A professional license is clearly essential for a fresh start, but a recreational fishing license or a concealed carry permit is not.  *Id.*  The commonality between these items is that each allows its bearer to engage in certain regulated conduct that is impermissible without it.  *Id.*

Turning to application, the PPP loan is not an authorization to pursue some endeavor or livelihood.  *See, e.g.*, *Vestavia Hills*, 2021 WL 1263953, at *18; *Tradeways, Ltd v. U.S. Dep't of the Treasury*, No. ELH-20-1324, 2020 WL 3447767, at *17 (D. Md. June 24, 2020) (unpublished).  Rather, it is a loan with analogs in the private sector, albeit on less favorable terms (such as the absence of loan forgiveness guarantees).  Accordingly, the bankruptcy bar does not run afoul of 11 U.S.C. § 525(a).

Appellee argues, and the Bankruptcy Court held, that a PPP loan falls within the ambit of 11 U.S.C. § 525(a) since it is functionally a "grant."  *Doc. 24* at 27–29; BRA vol. 1 at 109–10.  In so doing, they appear to use the colloquial meaning related to financial

awards typically premised upon financial need which do not need to be repaid except in limited circumstances. *See, e.g.*, 20 U.S.C. § 1070a (Federal Pell Grants).

This approach is mistaken for two reasons. First, as discussed above, the statutory context of "other similar grant" limits the term to an authorization to pursue some endeavor that cannot be permissibly done without it. Second, even if the broader meaning of "grant" was applied, a PPP loan would not fall within it because it is a loan with conditions for its forgiveness rather than a financial award with conditions for its use. "[T]he word 'loan' appears some 75 times in the CARES Act provisions establishing the PPP." *Tradeways*, 2020 WL 3447767, at *17. A PPP loan has an interest rate and a maturity date at which point the borrower must repay any unforgiven loan balance. *See* CARES Act, § 1102, 134 Stat. at 291 (codified as 15 U.S.C. § 6363(a)(36)(K) and (L)). The statutory scheme also contemplates unforgiven loan balances since its conditions for loan forgiveness are narrower than its conditions for loan use. *Compare id.* at 290 (codified 15 U.S.C. § 636(a)(36)(F)(II) and (VII)) (listing costs related to insurance premiums, continuing group health care benefits, and interests on debt obligations incurred before receiving a PPP loan as allowable uses of PPP loan funds) *with id.* § 1106, 134 Stat. at 298 (codified in 15 U.S.C. § 636m) (omitting these costs from the list of forgivable costs). Finally, Congress grafted the PPP into the pre-existing statutory and regulatory architecture for ordinary Section 7(a) loans by amending 15 U.S.C. § 636(a), the part of the U.S. Code that lists other loans that the SBA

Administrator may make and the requirements that she must follow when doing so. *See id.* at 286. The possibility that some, if not all, of a PPP loan may be forgiven does not make it any less of a loan. Several other federal loan programs provide for loan forgiveness if certain criteria are met. *See, e.g.*, 20 U.S.C. § 1087e(m)(1) (Public Service Student Loan Forgiveness Program); 20 U.S.C. § 1087j(b) (Teacher Loan Forgiveness Program).

### 2. *Exceeding Statutory Authority*

Turning to Appellee's APA challenges, I find that the bankruptcy bar does not exceed the SBA Administrator's statutory authority. 5 U.S.C. § 706(2)(C) requires a court reviewing an agency action to hold it unlawful and set it aside if the court finds it "to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Courts apply the *Chevron* doctrine—named after the Supreme Court's seminal decision in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)—to "determin[e] whether an agency's regulations are valid under a particular statute." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017). This doctrine prescribes a two-step process.

At step one, courts ask "whether the statute unambiguously addresses the 'precise question at issue.'" *Id.* (quoting *Chevron*, 467 U.S. at 842). "If Congress has spoken directly to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent." *United*

*Keetoowah Band of Cherokee Indians v. U.S. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1240 (10th Cir. 2009). But if the statute is ambiguous as to the precise question at issue, courts proceed to step two. There, they must "defer to the agency's interpretation unless it is arbitrary, capricious, or manifestly opposed to the plain meaning of the statute." *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1111 (10th Cir. 2021) (citation omitted).

This two-step process, however, does not apply if the agency did not issue its interpretation pursuant to a Congressional delegation of authority to make rules carrying the force of law or if the precise question at issue is so extraordinary that statutory ambiguity is not an implicit Congressional delegation to the agency to address statutory gaps. *King v. Burwell*, 576 U.S. 473, 485 (2015); *Carpio v. Holder*, 592 F.3d 1091, 1096–97 (10th Cir. 2010) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)).

    a.  Exceptions to *Chevron* Are Not Applicable

I conclude that that the *Chevron* doctrine applies to the precise question at issue—whether a bankruptcy debtor is eligible for a PPP loan. The *Mead* exception to *Chevron* does not apply because the SBA issued the bankruptcy bar pursuant to the rule-making authority delegated to it by Congress in Section 1114 of the CARES Act. Fourth Rule, 85 Fed. Reg. at 23,450; *see also* CARES Act, § 1114, 134 Stat. at 312.[5]

---

[5] As noted earlier, the SBA Administrator also has the authority to "make rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to [Chapter 14A of Title 15 of the U.S. Code]." 15 U.S.C. § 634(b)(6). This authority includes "tak[ing] any and all actions …. when he determines such actions are necessary or desirable in making … or otherwise dealing with or realizing on loans made under the provisions of this chapter," like PPP loans. 15 U.S.C. § 634(b)(7); *see also* 15 U.S.C. §

The *King* exception to *Chevron* does not apply since bankruptcy debtors'

eligibility for a PPP loan is not an extraordinary question. This "extraordinary case"

exception arises from a line of Supreme Court precedent that starts with *FDA v. Brown*

*& Williamson Tobacco Corp.*, 529 U.S. 120 (2000). There, pursuant to a Congressional

grant of rule-making authority in 21 U.S.C. § 371(a), the Food and Drug Administration

("FDA") published a rule concluding, notwithstanding its contrary representations to

Congress for several decades, that the Food, Drug, and Cosmetic Act ("FDCA") gave it

the jurisdiction to regulate nicotine, cigarettes, and smokeless tobacco. *Brown &*

*Williamson*, 529 U.S. at 127. At step one of the *Chevron* framework, the Supreme Court

read the FDCA and the history of tobacco-specific legislation to manifest a clear

Congressional intent to exclude tobacco products from the FDA's jurisdiction, *id.* at 133,

relying in part on its findings that the tobacco industry "constitut[ed] a significant

portion of the American economy" and tobacco "has its own unique political history."

*Id.* at 159.

The next case in the precedential line is *Utility Air Regulatory Group. v. EPA*, 573

U.S. 302 (2014). There, after the Supreme Court held in *Massachusetts v. EPA*, 549 U.S.

497, 528 (2007), that Title II of the Clean Air Act authorized the Environmental

Protection Agency ("EPA") to regulate greenhouse gas emissions from new motor

---

636(a)(36). The SBA, however, did not cite this rule-making authority when promulgating the
bankruptcy bar.

vehicles, the EPA issued two rules. The first rule identified certain greenhouse gases emitted by new motor vehicles as air pollutants. The second rule declared that, due to the first rule, any stationary source (e.g., a factory or a powerplant) with the potential to emit these greenhouse gases in excess of statutory thresholds was subject to two Clean Air Act permitting regimes. *Utility Air*, 573 U.S. at 310–312. At *Chevron* step two, the Supreme Court held that the EPA's interpretation of the Clean Air Act in the second rule was "unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization" and Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* at 324 (quoting *Brown & Williamson*, 529 U.S. at 160); *see also id.* at 322 (noting that the second rule would increase the number of sources requiring permits in the first regime from about 800 to nearly 82,000 and the number of sources requiring permits in the second regime from fewer than 15,000 to about 6.1 million).

The final case in this line is *King v. Burwell*, 576 U.S. 473 (2015). There, the IRS promulgated a rule that made health insurance tax credits authorized by the Patient Protection and Affordable Care Act ("ACA") available in both state and federal health insurance exchanges. *King*, 576 U.S. at 483. The Supreme Court found that the availability of tax credits in federal exchanges was "a question of deep 'economic and political significance' that is central to [the ACA's] statutory scheme" since the credits

entailed billions of dollars of annual spending and affected the price of health insurance for millions of people. *Id.* at 486 (citing *Utility Air*, 573 U.S. at 324). It then refused to apply the *Chevron* framework to the IRS's rule because, if Congress had wished to assign the resolution of the question to the IRS—an agency with no expertise in crafting health insurance policy—"it surely would have done so expressly." *Id.*

The bankruptcy bar does not implicate any of the concerns that animate this exception. First, while the economic crisis created by COVID-19 is a question of deep economic and political significance, a bankruptcy debtor's eligibility for a PPP loan—one of several economic assistance programs created by Congress to mitigate this crisis—is not one. *See Gateway Radiology Consultants*, 983 F.3d at 1255 n.8 (holding that bankruptcy debtors' eligibility for a PPP loan does not fall within the extraordinary question exception to *Chevron*); *Vestavia Hills*, 2021 WL 1263953, at *11–12 (same). The economic impact of the bankruptcy bar is orders of magnitude smaller than that of the tax credits in *King*, the regulation of stationary sources' greenhouse gas emissions in *Utility Air*, or the regulation of the tobacco industry in *Brown & Williamson*. Second, unlike *Utility Air* or *Brown & Williamson*, this is not a situation in which an agency has reinterpreted a statute to grant it long-disclaimed regulatory authority. As noted earlier, the SBA has not only long regulated the eligibility criteria for Section 7(a) loans like the PPP, but also has long considered an applicant's bankruptcy history when determining its eligibility. Finally, unlike the IRS in *King*, the SBA has considerable

expertise in setting eligibility requirements for its loan products. It has been doing so

for decades. Accordingly, bankruptcy debtors' eligibility for a PPP loan is not an

extraordinary enough question to fall outside the *Chevron* framework.[6]

      b.  *CHEVRON* STEP ONE

Turning to *Chevron* step one, I find the CARES Act ambiguous as to bankruptcy

debtors' eligibility for a PPP loan. At this step of *Chevron*, "courts are to employ

traditional tools of statutory construction," which "include examination of the statute's

text, structure, purpose, history, and relationship to other statutes." *Am. Fed'n of Gov't

Emps., Local 1592 v. Fed. Lab. Rels. Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (internal

quotation marks, brackets, and citations omitted). As noted earlier, courts should not

examine statutory provisions in isolation as "the meaning—or ambiguity—of certain

words or phrases may only become evident when placed in context." *Nat'l Ass'n of

Home Builders*, 551 U.S. at 666. This context includes not only other provisions in a

particular piece of legislation but also the applicable statutory and regulatory scheme

that existed when Congress passed it. *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571

---

[6] The SBA argues that the extraordinary question doctrine only applies where Congress has not expressly delegated rulemaking authority to an agency. *Doc. 25* at 11–12. This argument reads *King* in isolation and ignores the line of precedent from which it arises. In both *Utility Air* and *Brown & Williamson*, the Supreme Court applied the extraordinary question doctrine to rules issued pursuant to express delegations of rulemaking authority (albeit doing so inside—rather than outside—the *Chevron* framework). Given this line of precedent, I do not so limit the extraordinary question doctrine.

U.S. 161, 169 (2014). When the provisions enacting the PPP loan program are read in this manner, there is no clear statutory proscription against the bankruptcy bar.

As noted earlier, Congress did not create the PPP as a standalone program, but rather grafted it into the existing statutory and regulatory architecture for a generic Section 7(a) loan. *See* CARES Act, § 1102, 134 Stat. at 286. In doing so, it modified some, but not all, of the general statutory and regulatory Section 7(a) loan eligibility requirements as to the PPP. *Compare id.* at 288 (codified as 15 U.S.C. § 636(a)(36)(D)) (modifying the size eligibility criterion); *id* at 291 (codified as 15 U.S.C. § 636(a)(36)(I)) (exempting the PPP loan from the inability to obtain credit elsewhere criterion in 15 U.S.C. § 632(3)(h)) *with id.* at 287 (codified as 15 U.S.C. § 636(a)(36)(B)) (authorizing the SBA to guarantee PPP loans under the same terms, conditions, and processes as a generic Section 7(a) loan except as otherwise provided). Such selective modification demonstrates that "Congress knew how to suspend or render inapplicable to PPP loans the traditional § 7(a) requirements when it wanted to do so." *Gateway Radiology Consultants*, 983 F.3d at 1257.

One of the general statutory requirements for Section 7(a) loans that Congress retained for PPP loans is the "sound value" requirement in 15 U.S.C. § 636(a)(6). This requirement provides that all Section 7(a) loans "shall be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6). As noted earlier, the SBA has long implemented this requirement by mandating that lenders consider a

Section 7(a) loan applicant's bankruptcy history when assessing its creditworthiness during the underwriting process. *See* SOP 10 5(K) at 180.

The CARES Act is silent about how the sound value requirement should apply to the PPP. *Cf.* CARES Act, § 4003, 134 Stat. at 473 (prohibiting bankruptcy debtors from receiving a loan in a program or facility to be established by the Secretary of the Treasury to provide financing to lenders to make loans to certain mid-sized businesses). This silence supports two inferences: (i) an endorsement of the SBA's pre-existing eligibility policy that considers a Section 7(a) loan applicant's bankruptcy status but does not bar the applicant based upon it; or (ii) an endorsement of the SBA's discretion to determine how the "sound value" requirement is applied to a bankrupt loan applicant. Contrasting inferences like these are the definition of ambiguity.

The Bankruptcy Court found that the CARES Act clearly prohibits the bankruptcy bar by reading 15 U.S.C. § § 636(a)(36)(D)(i) and (F)(ii)(II) to establish four exclusive eligibility criteria:

1. Be a small business concern or any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) of the Small Business Act;
2. Have fewer than 500 employees or, if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates;
3. Have been in operation on February 15, 2020; and
4. Have had employees to whom the applicant pays salaries and payroll taxes.

BRA vol. 1 at 101.[7]  It is not the only court to do so.  *See, e.g.*, *DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin.*, 459 F. Supp. 3d 943, 956 (E.D. Mich. 2020).  This interpretation, however, ignores the Supreme Court's admonishment against reading statutory provisions in isolation, divorced from their larger statutory context.

Read in their proper context, 15 U.S.C. § 636(a)(36)(D)(i) and (F)(ii)(II) do not establish exclusive eligibility criteria for a PPP loan.  First, 15 U.S.C. § 636(a)(36)(D)(ii) expressly extends eligibility to "individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals," 15 U.S.C. § 636(a)(36)(D)(ii)(I), even though they fall outside the purported criteria described in 15 U.S.C. § 636(a)(36)(D)(i) and (F)(ii)(II).  Second, several provisions of the CARES Act do not treat 15 U.S.C. § 636(a)(36)(D)(i) and (F)(ii)(II) as establishing exclusive eligibility criteria.  *See id.* § 636(a)(36)(D)(iv) (waiving the affiliations requirements implemented in 13 C.F.R. § 121.103 with respect to PPP loan eligibility); *id.* § 636(a)(36)(I) (exempting a PPP loan from the credit-elsewhere eligibility requirement for a Section 7(a) loan); *id.* § 636(a)(36)(J) (providing that no personal guarantee or collateral is required to receive a PPP loan).  Reading 15 U.S.C. § 636(a)(36)(D)(i) and (F)(ii)(II) to establish exclusive eligibility criteria renders these provisions superfluous and "is thus at odds with one of the most basic interpretive canons."  *Corley v. United States*, 556 U.S. 303, 314 (2009).

---

[7] The Bankruptcy Court states these eligibility criteria as findings of fact. BRA vol. 1. at 101. But, as an interpretation of the CARES Act and 15 U.S.C. § 636(a), they are actually findings of law.  Therefore, I review them *de novo*.  *See Busch*, 294 B.R. at 140.

15 U.S.C. § 636(a)(36)(D)(i) is better read as "identify[ing] the types and size of organizations that are eligible to receive PPP funds." *Tradeways*, 2020 WL 3447767, at *13. Absent 15 U.S.C. § 636(a)(36)(D)(i), existing Section 7(a) regulations would have required a PPP loan applicant to be organized for profit and have a number of employees or sum of annual receipts that does not exceed the designated size standards for its industry. *See* 13 C.F.R. § 120.100. As noted earlier, when creating special Section 7(a) loan products like the PPP, Congress routinely includes provisions that exempt the new product from generic Section 7(a) loan requirements. 15 U.S.C. § 636(a)(36)(D)(i) is better read as a continuation of that practice.[8]

Similarly, 15 U.S.C. § 636(a)(36)(F)(ii)(II) is better read as prescribing two inclusive considerations that a lender must consider when evaluating a borrower's PPP loan eligibility. As noted earlier, private lenders have delegated authority to approve PPP loans without SBA review. Absent 15 U.S.C. § 636(a)(36)(F)(ii)(II), newly created entities without any employees or independent contractors would be eligible for a PPP loan, undermining Congressional intent to "provide economic relief to small businesses nationwide adversely impacted" by COVID-19. First Rule, 85 Fed. Reg. at 20,811. The import of 15 U.S.C. § 636(a)(36)(F)(ii)(II) is to ensure that PPP lenders direct PPP loans

---

[8] Appellee also reads 15 U.S.C. § 636(a)(36)(D) to set out exclusive eligibility loan criteria for the PPP. *See doc. 24* at 20–21. Curiously, one of the criteria identified by Appellee is that "the applicant be located in the United States." This criterion arises from 13 C.F.R. § 120.100(c), not the CARES Act, belying the argument that the CARES Act established exclusive eligibility criteria for a PPP loan.

to pre-existing employers so these employers can remain in business and continue to pay their employees.  *Cf.* CARES Act, § 1106, 134 Stat. at 299 (codified in 15 U.S.C. § 636m(d)) (reducing the amount of PPP loan forgiveness in proportion to any reduction in a borrower's number of employees or employees' wages/salaries).

The Bankruptcy Court and Appellee also read Section 4003(c)(3)(D) of the CARES Act to prohibit the SBA from categorically barring bankruptcy debtors from the PPP.  BRA vol. 1 at 109; *doc. 24* at 22–23.  Section 4003(b)(4) authorizes the Secretary of the Treasury Department "to make loan and loan guarantees to, and other investments in, programs or facilities established by the Board of Governors of the Federal Reserve System for the purposes of providing liquidity to the financial system that supports lending to eligible businesses, States, and municipalities." CARES Act, § 4003(b)(4), 134 Stat. at 470 (codified in 15 U.S.C. § 9042(b)(4)).  Section 4003(c)(3)(D) directs the Secretary to "seek the implementation of a program or facility described in subsection b(4) that provides financing to banks and other lenders that make direct loans to eligible [mid-sized] businesses."  *Id.* at 473 (codified in 15 U.S.C. § 9042(c)(3)(D)(i)).  One of the good-faith certifications that an applicant for one of these direct loans must make is that it is not a debtor in bankruptcy proceeding.  *Id*. (codified in 15 U.S.C. § 9042(c)(3)(D)(i)(V)).

Admittedly, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion."

*Russello v. United States*, 464 U.S. 16, 23 (1983).  Consequently, because Congress

included a bankruptcy bar in Section 4003(c)(3)(D), the Bankruptcy Court found the its

omission of a similar bar from Section 1102 to be intentional.  However, it is

considerably less clear what Congress intended by omitting a bankruptcy bar analogous

to that of Section 4003(c)(3)(D) from Section 1102.  The omission supports two

inferences: (i) Congress did not intend for PPP loan eligibility to hinge on whether an

applicant was a bankruptcy debtor; or (ii) Congress left the issue of these debtors'

eligibility to the SBA's discretion.  *See Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir.

2009) ("When interpretating statutes that govern agency action, we have consistently

recognized that a congressional mandate in one section and silence in another often

suggests not a prohibition but simply a decision *not to mandate* any solution in the

second context, i.e., to leave the question to agency discretion." (internal quotation

marks and citation omitted)).  As stated earlier, such conflicting interpretations are a

paramount example of ambiguity.[9]

---

[9] Appellant argues that Congressional intent for bankruptcy debtors to be eligible for a PPP loan cannot
be inferred from the lack of a bankruptcy bar in Section 1102 akin to that of Section 4003(c)(3)(D) because
the latter incorporates a pre-existing bankruptcy exclusion in 12 U.S.C. § 343(3) "merely for the
'avoidance of doubt.'"  *Doc. 22* at 31 (quoting CARES Act, § 4003(c)(3)(B), 134 Stat. at 472).  12 U.S.C. §
343(3) prohibits insolvent borrowers, such as a borrower in bankruptcy, from borrowing from Federal
Reserve programs and facilities.  12 U.S.C. § 343(3)(B)(ii).  However, in the mid-sized business loan
program described in Section 4003(c)(3)(D)(i), 12 U.S.C. § 343(3) applies to the bank or other lender that
receives financing from the Federal Reserve program or facility described in Section 4003(b)(4), not the
eventual recipient of a direct loan from this bank or lender.  *See* CARES Act, § 4003(c)(3)(D)(i), 134 Stat. at

c. *CHEVRON* STEP TWO

Moving to *Chevron* step two, I conclude that the bankruptcy bar is a permissible interpretation of the CARES Act. At *Chevron* step two, "the agency's interpretation need not be the only one it could have adopted, or the one that [the] court would have reached had the question initially arisen in a judicial proceeding." *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1181 (10th Cir. 2005) (internal brackets and citation omitted). It only need not be "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. The arbitrary and capricious inquiry here is not the hard look review of the agency's decision-making process prescribed by 5 U.S.C. § 706(2)(A), but rather an assessment of the reasonableness of that process's substantive result. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521–23 (2d. Cir. 2017). This standard requires that the agency provide some valid justification for its interpretation. *Id.* at 521 ("An agency interpretation would surely be 'arbitrary' or 'capricious' if it were picked out of a hat, or arrived at with no explanation…."); *see also Herrera-Castillo v. Holder*, 573 F.3d 1004, 1008–09 (10th Cir. 2009) (assessing the propriety of the agency's rationale at *Chevron* step two).

The justification provided by the SBA for the bankruptcy bar is reasonable. When promulgating it, the SBA Administration explained that "in consultation with the

---

473. Therefore, the provision in Section 4003(c)(3)(D)(i)(V) that bars bankrupt businesses from receiving a direct loan does not rearticulate 12 U.S.C. § 343(3)'s preexisting bankruptcy bar.

Secretary [of Treasury], [it] determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or nonrepayment of unforgiven loans." Fourth Rule, 85 Fed. Reg. at 23,451. For normal Section 7(a) loans, a lengthy underwriting process mitigates this risk. Subjecting PPP loans to this process, however, would frustrate "[t]he intent of the [CARES] Act … that SBA provide relief to America's small businesses expeditiously." *Id.* at 23,450. So, the SBA exempted PPP loans from it and reduced the underwriting process for a PPP loan to four steps. *See* First Rule, 85 Fed. Reg. at 20,815. PPP loans, however, still have to comply with the "sound value" statutory requirement. Faced with conflicting needs to accommodate this requirement and get PPP funds to employers as soon as possible, the SBA promulgated a bright-line rule that barred bankruptcy debtors from receiving PPP loans. Such an accommodation of "manifestly competing interests" is reasonable and a classic scenario for *Chevron* deference. *Gateway Radiology Consultants*, 983 F.3d at 1257; *see also Chevron*, 467 U.S. at 865 (deferring to an agency's interpretation where it reasonably resolves clearly competing interests).

The Bankruptcy Court found the SBA's justification substantively unreasonable since other criteria could more accurately gauge a borrower's likelihood of complying with the PPP. BRA vol. 1 at 107 & n.6 (identifying other possible underwriting criteria). This finding is an impermissible policy judgment in disguise. *See Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 730 (10th Cir. 2006) (noting that, at *Chevron* step

two, "[t]he only question for [the court] is whether the [agency]'s construction of the statute is permissible, not the best."). Doubtlessly, there are better metrics than a borrower's bankruptcy status for determining the "sound value" of making a PPP loan to that borrower and the likelihood that a borrower would spend the loan's funds on permissible costs. The SBA, however, found that these metrics' transaction costs undermined Congress's intent to provide capital to businesses quickly and efficiently. *See* First Rule, 85 Fed. Reg. at 20,815 (exempting PPP loans from the normal underwriting process in which the totality of a borrower's circumstances, including its bankruptcy, is assessed to determine its eligibility for a Section 7(a) loan). In barring bankruptcy debtors from the PPP, the SBA prioritized speed and efficiency over accessibility and individualized risk assessment. Regardless of the Court's view on the soundness of this preference as a matter of policy, it is sufficiently reasoned and in harmony with the CARES Act to merit deference. *See Gateway Radiology Consultants*, 983 F.3d at 1262; *Vestavia Hills*, 2021 WL 1263953, at *13; *Diocese of Rochester v. U.S. Small Bus. Admin.*, 466 F. Supp. 3d 363, 378 (W.D.N.Y. 2020); *Tradeways*, 2020 WL 3447767, at *15.

It is also worth noting that, since the SBA promulgated the bankruptcy bar, subsequent PPP legislation has implicitly ratified—rather than amended or rescinded— it. "Non-action by Congress is not often a useful guide, but the non-action here is significant." *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983). As noted earlier, in the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act,

Congress amended a provision of the Bankruptcy Code to enable a bankruptcy court to authorize certain entities in certain bankruptcy proceedings to obtain a PPP loan. § 320, 134 Stat. at 2015. Rather than have the amendment take effect immediately, Congress conditioned its effectiveness on the SBA Administrator "submit[ting] to the Director of the Executive Office for United States Trustees a written determination that, subject to satisfying any other eligibility requirements, [these entities] would be eligible for a [PPP] loan." *Id.* at 2016. The condition precedent in this sunrise provision is an implicit reaffirmation of the SBA's discretion to determine the eligibility of bankruptcy debtors to the PPP loan and the reasonableness of its choice to exclude them. If Congress had wished to abrogate the bankruptcy bar and extend PPP loan eligibility to bankruptcy debtors, it could have done so. *Cf. id.* §§ 316–18, 134 Stat. at 2011–13 (extending PPP loan eligibility to various entities).

3. *Arbitrary & Capricious*

Finally, I find that the bankruptcy bar is not arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). Under this standard, the Court takes a hard look review at the SBA's decision-making process. But the scope of this review is narrow: the Court must ensure that the SBA "remained within the bounds of reasoned decisionmaking," but "not substitute [its] judgment for that of the [agency]." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). Reasoned decision-making by the SBA is presumed. *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019).

47

For the bankruptcy bar to survive this review, the SBA "need only [to have] 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1254 (10th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The only explanation that the Court may consider in its review is the one that the SBA provided when it promulgated the bankruptcy bar. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

The SBA's bankruptcy bar fails the Court's review if the SBA made a clear error in judgment or did not consider all and only the relevant factors when issuing it. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). Clear error in judgment exists if the SBA's explanation for the bankruptcy bar runs counter to the evidence before it or is so implausible that it could not be ascribed to a difference in opinion or the product of its expertise. *Renewable Fuels Ass'n*, 948 F.3d at 1254. The SBA failed to consider all and only the factors relevant to the bankruptcy bar if it did not consider an important aspect of the problem or it relied on factors that Congress did not intend for it to consider. *Id.*

The bankruptcy bar survives hard look review since it is rationally connected to the factual determination by the SBA Administrator and the Secretary of the Treasury "that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or nonrepayment of unforgiven loans."

Fourth Rule, 85 Fed. Reg. at 23,451. As noted earlier, SBA manages this risk with respect to ordinary Section 7(a) loans via a lengthy underwriting process that considers the unique circumstances of each bankruptcy debtor, rather than categorically barring them from receiving a loan. In the First Rule, though, the SBA exempted PPP loans from this process to accommodate Congressional intent for expeditious issuance of PPP loans. Categorically banning bankruptcy debtors from receiving PPP loans is a logical outgrowth of this exemption. *See Gateway Radiology Consultants*, 983 F.3d at 1263. If expediency precludes lenders from taking the time to assess the specific risk of unauthorized use or nonrepayment posed by an individual bankruptcy debtor, a categorical bar is a reasonable means of addressing the risk posed by these potential applicants as a group.

True, the SBA's contemporaneous explanation for the bankruptcy bar did not connect the bar to the finding of the risk posed by bankruptcy debtors with the above level of detail. An agency's explanation for its decision, though, need not be a model of clarity so long as the Court can reasonably discern the path that the agency took to its decision. *State Farm*, 463 U.S. at 43. I can do so here. At the beginning of the Fourth Rule, the SBA emphasized that Congress intended for it to provide relief to small businesses expeditiously. Fourth Rule, 85 Fed. Reg. at 23,450. The SBA also implicitly referenced PPP loans' exemption from the traditional underwriting process for Section 7(a) loans by informing lenders that they "may rely on an applicant's representation

concerning the applicant's … involvement in a bankruptcy proceeding." *Id.* at 23,451. These statements indicate that, when issuing the bankruptcy bar, the SBA considered not only the risk that PPP funds lent to bankruptcy debtors would be uncollectable or used for an unauthorized purpose, but also the process for issuing PPP loans rapidly. It follows that the SBA issued the bankruptcy bar to mitigate the former and accommodate the latter.

The Bankruptcy Court found, and Appellee argues, that Congress did not intend for the SBA to consider creditworthiness and loan repayment when determining PPP loan eligibility. BRA vol. 1 at 106–07; *doc. 24* at 24. This argument clashes with the "sound value" requirement in 15 U.S.C. § 636(a)(6), which makes collectability not only relevant to PPP loan eligibility but also a factor that the SBA must consider when establishing eligibility criteria. *See Vestavia Hills*, 2021 WL 1263953, at *16.

The Bankruptcy Court also found, and Appellee also argues, that bankruptcy courts' supervision of Chapter 11 debtors makes the SBA's factual determination that bankruptcy debtors present an unacceptably high risk for unauthorized use or nonrepayment of PPP funds so implausible that it amounts to a clear error in judgment. BRA vol. 1 at 107–08; *doc. 24* at 25. Bankruptcy courts' supervision, however, is not as robust as the Bankruptcy Court and Appellee claim.

Bankruptcy court supervision does not necessarily ensure that a bankruptcy debtor uses PPP funds in compliance with the CARES Act and the First Rule. In the

CARES Act, Congress provided eight uses for PPP funds: (i) payroll costs; (ii) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums; (iii) employee salaries, commissions, or similar compensations; (iv) payments of interest on any mortgage obligation; (v) rent; (vi) utilities; (vii) interest on any other debt obligations that were incurred before February 15, 2020; and (viii) any use of a Section 7(a) loan listed in 13 C.F.R. § 120.120.[10] *See* § 1102, 134 Stat. at 290 (codified in 15 § 636(a)(36)(F)).  SBA regulations, though, require a borrower to allocate seventy-five percent of its PPP loan to payroll costs.   First Rule, 85 Fed. Reg. at 20,814.

PPP funds are unsecured, *see* 15 U.S.C. § 636(a)(36)(J), and so are not "cash collateral," *see* 11 U.S.C. § 363(a).  Therefore, absent a discretionary court order otherwise, the bankruptcy debtor may use them "in the ordinary course of business" without involving the bankruptcy court.  *See id.* § 363(c).  Depending on the nature of the bankruptcy debtor's business and its liquidity, these transactions could result in the debtor using PPP funds in violation of the CARES Act and the First Rule.  *See, e.g., In re 211 Waukegan, LLC,* 479 B.R. 771, 777 (Bankr. N.D. Ill. 2012) (eviction attorney's fees); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-*

---

[10] These uses are: (i) acquiring land (by purchase or lease); (ii) certain real property improvements; (iii) purchasing one or more existing buildings; (iv) converting, expanding, or renovating one or more existing buildings; (v) constructing one or more new buildings; (vi) acquiring (by purchase or lease) and installing fixings; (vii) inventory; (viii) supplies; (ix) raw materials; (x) working capital; and (xi) refinancing certain outstanding debts.  13 C.F.R. § 120.120.

*Manville Corp.)*, 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986) (fees of outside lobbyists and

consultants). Even where the bankruptcy court is involved, it has no obligation to

ensure that PPP funds are used consistently with the CARES Act and/or the First Rule.

*See, e.g.*, Seventh Interim Order on Debtor's Emergency Motion at 3, 6, *In re Alaska

Urological Inst. P.C.*, No. 20-00086 GS (Bankr. D. Alaska Sep. 3, 2020), ECF No. 183

(authorizing the bankruptcy debtor to spend more than twenty-five percent of its PPP

loan on non-payroll costs, including unauthorized uses like malpractice insurance and

professional fees). And where a debtor has filed under Chapter 7 (or converted its

bankruptcy case to a Chapter 7 one pursuant to 11 U.S.C. § 1112(a)), enforcing the

distribution of the debtor's property under 11 U.S.C. § 726 may require the bankruptcy

court to allocate PPP funds in a manner that falls below the payroll cost threshold in the

First Rule or to expenses (e.g., administrative ones) that are not allowed by the CARES

Act. *See* 11 U.S.C. §§ 507(a)(2), 726(a)(1). Given these possibilities, the SBA's finding

that bankruptcy debtors' receipt of PPP funds risks their misuse is hardly implausible.

Similarly, bankruptcy court supervision also does not ensure that any unforgiven

PPP loan balance is collectable. Any PPP loan received by a bankruptcy debtor would

be unsecured credit obtained subsequent to bankruptcy pursuant to 11 U.S.C. § 364.

Absent a court order otherwise, a bankruptcy debtor could obtain a PPP loan in "the

ordinary course of business" to cover "the actual, necessary costs and expenses of

preserving the [bankruptcy] estate" without a notice or a hearing. *See id.* §§ 364(a),

503(b)(1)(A).  A PPP loan obtained in this manner would be an "administrative expense."  *Id.* § 364(a).  In reorganization proceedings under Chapter 11, this classification gives the PPP creditor the right to veto any plan that does not repay any unforgiven PPP balance in full.  *See id.* §§ 507(a)(2), 1129(a)(9)(A).  In liquidation proceedings under Chapter 7, this classification gives the creditor's claim the highest available repayment priority for an unsecured claim against a corporate debtor.  *See id.* §§ 507(a)(2), 726(a)(1).  In both cases, however, this classification does not ensure total repayment as a bankruptcy estate may be (or become) administratively insolvent (lack sufficient funds to discharge all administrative expense claims against it).  In a Chapter 11 reorganization, such insolvency could require the PPP creditor to approve a plan that repays it less than the total amount owed after forgiveness to receive any repayment at all.  In a Chapter 7 liquidation, such insolvency would cause the PPP creditor to receive only a pro rata share of the unforgiven balance.  *See id.* § 507(b).  Given these possibilities, the SBA's finding that bankruptcy debtors' receipt of PPP loans risks incomplete repayment of any unforgiven balance is hardly implausible.

Appellee's final argument is that, when issuing the bankruptcy bar, the SBA failed "to consider the issue that Congress was attempting to address in the CARES Act—businesses experiencing distress because of COVID-19."  *Doc. 24* at 24.  This argument is difficult to square with the text of the Fourth Rule that contains the bar.  Therein, the SBA notes that "[t]he PPP is intended to provide economic relief to small

businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID-19)." Fourth Rule, 85 Fed. Reg. at 23,450. Clearly, the SBA did consider the issue of businesses in distress due to COVID-19. It is not, however, the only issue that the SBA considered. As noted earlier, when promulgating the bankruptcy bar, the SBA had to balance this issue with the statutory requirement that PPP loans be of "sound value" and the Congress's intent for relief to be provided expeditiously. Striking a balance that tilts against providing economic relief to every small business in distress in favor of providing expeditious relief to most small businesses and small businesses that pose little risk of misuse or nonrepayment of PPP funds does not mean that the SBA did not consider the distress that COVID-19 was causing all businesses. It just means that the SBA judged that issue to be less important than other competing considerations.

## V.    CONCLUSION

For the reasons above, I recommend that the Bankruptcy Court's final judgment in favor of Appellee and against the SBA be REVERSED and that the underlying adversary proceeding be REMANDED to the Bankruptcy Court for further proceedings consistent with my findings.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**